# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TIMOTHY HINSDALE,         )
                            )
        Plaintiff,       )
                            )      No. 15 C 4926
      v.               )
                            )      Judge Sara L. Ellis
VILLAGE OF WESTCHESTER, ILLINOIS, )
POLICE OFFICERS KRISTINA TOUNTAS, )
Star No. 148, A. RAUGLAS, Star. No. 150, )
M. FELLERS, Star No. 153, and DETECTIVE )
RON MIKLAS,           )
                            )
        Defendants.   )

## <u>OPINION AND ORDER</u>

Plaintiff Timothy Hinsdale alleges that Defendants Village of Westchester (the "Village"), Officer Kristina Tountas, Officer Adam Rauglas, Officer Michael Fellers, and Detective Ron Miklas unlawfully detained him after his warrantless arrest and delayed his probable cause hearing for at least sixty hours, violating 42 U.S.C. § 1983. The parties have filed cross-motions for summary judgment [40, 43]. Because Defendants cannot justify why Hinsdale did not receive a probable cause within 48 hours of his arrest, the Court finds that Defendants violated his constitutional right to a probable cause hearing. The Court denies Defendants' and Hinsdale's cross-motions regarding personal liability, however, because a material issue of fact exists as to whether Tountas or Miklas caused that violation. Because no reasonable jury could find that Rauglas or Fellers caused Hinsdale's unlawful detention, the Court enters judgment for Rauglas and Fellers. Finally, the Court defers ruling on the cross-motions regarding the Village's liability because a jury must resolve the liability of Tountas and Miklas.

# BACKGROUND[1]

At approximately 8:00 p.m. on Tuesday, October 8, 2013, Adrianna Chavarin, a Village resident, called 9-1-1, claiming that Hinsdale was outside her house taking pictures. Tountas responded to the call and learned that Chavarin's family had previously complained about Hinsdale harassing them. Upon returning to the Village Police Department station (the "Police Station"), Tountas determined that she had probable cause to believe that Hinsdale was stalking Chavarin. Without first obtaining an arrest warrant, she went to Hinsdale's home with Rauglas as her backup, asked Hinsdale to step outside, and then arrested him at approximately 10:03 p.m. on the night of October 8.

Rauglas transported Hinsdale to the Police Station, inventoried his property, including a cell phone and a memory stick storage device, and placed Hinsdale in a temporary holding cell. Tountas then took Hinsdale to an interrogation room and read him his Miranda rights. After Hinsdale refused to answer Tountas' questions without a lawyer present, he was taken to a cell in the Police Station's "lockup" at approximately 10:20 p.m. Rauglas was present in the interrogation room while Tountas read Hinsdale his Miranda rights and had no further interactions with Tountas.

Immediately after Hinsdale went to lockup, Tountas contacted an assistant state's attorney ("ASA") to begin the felony review process. The ASA requested a search warrant for Hinsdale's cell phone. Tountas called Miklas to ask for help preparing a search warrant and Miklas provided her with samples of warrants. Tountas prepared the search warrant and the following day, on the morning of October 9, Tountas and Miklas obtained judicial approval of

---

[1] The facts in this section are derived from the parties' Joint Statement of Undisputed Material Facts. The Court includes in this background section only those portions of the statements of fact that are appropriately presented, supported, and relevant to resolution of the pending cross-motions for summary judgment. All facts are taken in the light most favorable to the non-movant in each motion.

the search warrant.  After they received a signed search warrant, Miklas had the crime lab process the phone.  Tountas then reviewed the data pulled from the phone.

The Police Department performed well-being checks on detainees in lockup.  Normally, records clerks performed the checks, but patrol officers also performed the checks as assigned by the shift commander, who is a sergeant with responsibility for the lockup and supervisory responsibility for all detainees.  A sergeant scheduled Tountas to perform these well-being checks, and she checked on Hinsdale on Wednesday, October 9 at 12:30 a.m., 1:00 a.m., 1:30 a.m., 2:30 a.m., 4:00 p.m., 4:30 p.m., 5:00 p.m., 5:30 p.m., and 6:30 p.m., and again on Thursday, October 10 at 9:30 p.m.  Miklas checked on Hinsdale on Wednesday, October 9 at 3:30 p.m. and on Thursday, October 10 at 6:20 p.m.  Fellers also received an assignment to perform well-being checks on detainees in the lockup on Wednesday, October 9, and he checked on Hinsdale three times on October 9 at 6:00 p.m., 7:00 p.m., and 7:30 p.m.  Other than these well-being checks, Fellers had no other interaction with Hinsdale.

The State's Attorney's Office ("SAO") approved felony charges against Hinsdale on Thursday, October 10 at approximately 7:00 p.m.  On Friday, October 11, an unidentified officer took Hinsdale from his lockup cell for fingerprints and photographs.  An unidentified officer then drove Hinsdale to the Cook County Circuit Court and turned Hinsdale over to Cook County Sheriff deputies between 7:30 and 8:30 a.m.  Hinsdale had a bond hearing between 10:00 a.m. and 12:00 p.m. on Friday, October 11.

Miklas and Tountas received Westchester Police Department General Order 97 ("General Order 97") as part of their police training.  General Order 97.1.4 states that the "[m]aximum period of detention in the Westchester lockup does not normally exceed forty eight (48) hours unless detention occurs at the beginning of a weekend or holiday or in the event of an on-going

investigation and at the direction of the state's attorney." Doc. 42-13 at 4; Doc. 42 ¶ 47. The

Village replaced General Order 97 with Westchester Police Department Policy 900 governing

Temporary Holding Facilities ("Policy 900").[2] Policy 900 states that "[t]he maximum period of

detention in a Temporary Holding Facility should not normally exceed 48 hours, except when

detention occurs at the beginning of a weekend or holiday." Doc. 42-10 at 7; Doc. 42 ¶ 50.

Sergeants authorize the movement of a prisoner in or out of detention. Under Policy 900, the

arresting officer's supervisor has the responsibility to authorize the placement of a detainee in the

Police Station's temporary holding facility. Tountas began working at the Village's Police

Department in 2009. She does not know if she ever saw a copy of Policy 900. Miklas began

working for the Village's Police Department in 1996 and became a detective in 2011. He

received no training on the appropriate length of time for a detention, but he reviewed General

Order 97 and Policy 900.

---

[2] It is unclear when the Village instituted Policy 900. The Joint Statement of Facts states that "General Order 97 was replaced by Policy 900 governing Temporary Holding Facilities, adopted 11/16/09." Doc. 42 ¶ 48. Although that fact statement cites two sources—Miklas' deposition and the affidavit of Deputy Chief of Police Michael O'Hagan's affidavit—neither source states that Policy 900 was adopted on November 16, 2009. *See generally* Doc. 42-8; Doc. 42-10. O'Hagan's affidavit states that Policy 900 was in effect on October 8, 2013, Doc. 42-10 at 1 (Affidavit ¶ 3), and Policy 900 itself bears a legend stating it was "Adopted: 2013/10/01," Doc. 42-10 at 6–18. The Joint Statement, however, does not cite either of these two statements, so the Court will not consider them as undisputed facts on which the Court can rely, especially in light of the purported 2009 adoption date set forth in the Joint Statement of Facts that is four years earlier than the legend on Policy 900 itself.

Hinsdale challenges the inclusion of facts from O'Hagan's affidavit in the Joint Statement of Facts. Hinsdale could have challenged any facts included in the Joint Statement of Facts before summary judgment, pursuant to the Court's case procedures. And although Hinsdale's rationale for challenging facts from O'Hagan's affidavit is that O'Hagan was not disclosed as a fact witness, which normally would be an issue under the Federal Rules of Civil Procedure, O'Hagan's affidavit provides facts that only address Hinsdale's claim against the Village. The parties stayed discovery on Hinsdale's claim against the Village after the Village stipulated it would pay damages if an individual Defendant was found liable. *See* Doc. 33 (acknowledging that discovery was stayed); *see also* Doc. 36 (denying motion to lift stay and setting summary judgment briefing schedule). Hinsdale chose to pursue summary judgment on his claim against the Village now, so the Court will not strike the O'Hagan affidavit because the parties agreed to stay discovery.

Tountas testified that she did not have the authority to release Hinsdale from the temporary holding facility without her sergeant's approval. Fellers testified that the sergeant serving as shift commander is responsible for ensuring a prisoner is brought before a judge within 48 hours of arrest, and Tountas testified that the shift commander was responsible for when Hinsdale went to court. Rauglas testified that either the shift commander or the arresting officer was responsible for ensuring that Hinsdale was brought before a judge within 48 hours of his arrest. Miklas did not know of an emergency that delayed Hinsdale's probable cause hearing, and Tountas did not know of any impediment to bringing Hinsdale to court other than the SAO's investigation. Miklas did not do anything to ensure Hinsdale was brought before a judge for a probable cause hearing. Similarly, Tountas never asked or recommended to a supervisor to send Hinsdale to a probable cause hearing.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.*

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Defendants' motion for summary judgment, the Court views all evidence in the light most favorable to Hinsdale, and when considering Hinsdale's motion for summary judgment, the Court views all evidence in the light most favorable to Defendants. *Id.*

## ANALYSIS

### I.     Unreasonable Delay of Probable Cause Hearing after Warrantless Arrest

Hinsdale alleges that Defendants deprived him of liberty without due process by holding him in custody for more than 60 hours before a judicial determination of probable cause for his arrest.[3]  Both Hinsdale and Defendants have moved for summary judgment on Hinsdale's unlawful detention claim.[4]  After a person is arrested without a warrant and held, the Fourth Amendment requires a prompt determination of probable cause for continued pretrial restraint of

---

[3] Hinsdale also alleges that "Tountas, Rauglas, Fellers and Miklas sought to interrogate [Hinsdale] and obtain a statement from him even though he expressly had invoked his Fifth Amendment right against compelled incrimination and Fifth and Sixth Amendment right to counsel."  Doc. 1 ¶ 6.  The complaint is unclear whether Hinsdale seeks relief for this allegation, and the parties do not mention this allegation at all in the summary judgment briefing.  The Court orders the parties to provide notice of whether Hinsdale also pursues a Fifth or Sixth Amendment claim.

[4] Defendants argue that the Court should strike Hinsdale's cross-motion for failure to send a letter to Defendants outlining his arguments before filing the cross-motion, as required by the Court's summary judgment practices.  "District court judges, because of the very nature of the duties and responsibilities accompanying their position, possess great authority to manage their caseload" and may deny motions based on failure to follow the Court's rules.  *United States v. Reed*, 2 F.3d 1441, 1447 (7th Cir. 1993).  Because Defendants do not articulate any prejudice from Hinsdale's failure to follow the Court's standing order, the Court declines to strike Hinsdale's cross-motion.

liberty.  *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).[5]  48 hours is

the key metric for determining the reasonableness of the length of time between a warrantless

arrest and a probable cause hearing: "[d]etentions over 48 hours are presumptively unreasonable

and the state bears the burden of proving that specific circumstances justified the delay, while the

plaintiff bears the burden of showing any detention under 48 hours is unreasonable."  *Ortiz v.

City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011) ("*Ortiz II*"); *see also County of Riverside v.

McLaughlin*, 500 U.S. 44, 56–57, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991).

No dispute exists that, after Hinsdale's arrest, it took more than 48 hours for him to

receive a *Gerstein* hearing, and he spent approximately 60 hours in the custody of Village police

prior to that hearing.  Thus, Defendants have the burden to provide an acceptable reason for the

delay.  *McLaughlin*, 500 U.S. at 57.  Defendants argue that Hinsdale's detention of more than 48

hours was not unconstitutional because, although "[d]etentions for the purpose of 'gathering

additional evidence to justify the arrest, a delay motivated by ill will against the arrested

individual, or delay for delay's sake' are prohibited," that "is not what happened here."  Doc. 41

at 4 (quoting *McLaughlin*, 500 U.S. at 56).  Instead, they argue, extending the detention for the

search warrant and review of Hinsdale's phone to "bolster[ ] the case" was not unlawful under

*McLaughlin* because Tountas already had probable cause to arrest Hinsdale based on a witness

statement and because Tountas searched Hinsdale's phone at the SAO office's request to gather

evidence related to the crime for which he was arrested.  *Id.* (quoting *United States v. Daniels*, 64

F.3d 311, 314 (7th Cir. 1995) ("Daniels' argument seems to interpret *Riverside* to preclude law

enforcement from bolstering its case against a defendant while he awaits his *Gerstein* hearing;

that is a ludicrous position.")).

---

[5] Thus, the name "*Gerstein* hearing" for a probable cause hearing after a warrantless arrest.

Defendants' argument misses the mark because it relies on case law defining the reasonableness of detentions that do not exceed 48 hours, where the arrestee has the burden of proof to show an unreasonable delay. "[T]he Seventh Circuit has concluded, with respect to post-arrest detention of less than 48 hours, that delay in presentment in order to further investigate the offense for which the defendant was arrested passes muster under *County of Riverside*[.]" *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *6 (N.D. Ill. Jan. 16, 2012) ("*Wells I*") (comparing *Daniels*, 64 F.3d 311 (less than 48-hour detention), *United States v. Sholola*, 124 F.3d 803 (7th Cir. 1997) (less than 48-hour detention), and *Willis v. City of Chicago*, 999 F.2d 284 (7th Cir. 1993) (less than 48-hour detention)). But in detentions of longer than 48 hours, where the burden is on law enforcement to present an extraordinary circumstance, "delays for the purpose of gathering additional evidence are per se unreasonable." *Lopez v. City of Chicago*, 464 F.3d 711, 714 (7th Cir. 2006) ("Here, the defendants offered no reason for the five-day delay other than the continuation of their investigation[.]"); *Zawadowicz v. Vail*, No. 08 C 2550, 2012 WL 895494 (N.D. Ill. March 15, 2012) (holding that arresting officers unconstitutionally detained plaintiff by not turning him over in time for a *Gerstein* hearing within 48 hours); *Wells I*, 2012 WL 116040, at *6 (noting that "it is clear that the [*Lopez*] court was addressing delays of more than forty-eight hours, because that is what was at issue in the case"); *cf. Willis*, 999 F.2d at 289 & n.3 (noting in a detention of 45 hours that a municipality arguing "that it had a right to hold [the plaintiff] until it could build a better case for the denial of bail" ran afoul of both *Gerstein* and *McLaughlin*"). Thus, Defendants' proposed reason for the delay, that his arresting officer was gathering and reviewing more evidence, fails as a matter of law. *See McLaughlin*, 500 U.S. at 57 (detention of more than 48 hours without an acceptable reason from the government is unconstitutional); *Lopez*, 464 F.3d at 714 (detention for more than 48

hours to gather additional evidence after arrest based on eyewitness account is unconstitutional).

Hinsdale's detention of 60 hours prior to a *Gerstein* hearing violated his constitutional rights; therefore, the Court grants Hinsdale's cross-motion and denies Defendants' motion as to the injury and turns to the question of who may be liable for Hinsdale's injury.

## II.      Liability for Constitutional Injury

To prove liability under § 1983, Hinsdale must show that Defendants "caused the deprivation" of his federal right.  *Ortiz II*, 656 F.3d at 539; *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) ("§ 1983 requires that a defendant be personally involved in the alleged constitutional deprivation.").  Defendants move for summary judgment, arguing that, despite a constitutional violation, Hinsdale cannot show that any of the Defendant police officers or the Village caused the delay of more than 48 hours.  Cross-moving for summary judgment, Hinsdale argues that each individual Defendant is personally liable for causing the unlawful detention and that the Village is liable as well.  The Court first turns to the personal liability of the individual Defendants.

## III.     Individual Defendant liability

"[T]o be liable under § 1983, the individual defendant must have 'caused or participated in a constitutional deprivation.'"  *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)).  "An official causes a constitutional violation if he [or she] sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights."  *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000) (citing *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999)).  "[I]f she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs

at her direction or with her knowledge or consent," then the police officer is personally responsible and liable under § 1983.  *Id.* (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)); *Matz*, 769 F.3d at 530 (defendants could not be held liable for § 1983 violation where plaintiff did not present evidence that defendants participated in unlawful act).  Decisions from various courts in this district and circuit demonstrate the bounds of what it means for a law enforcement official to personally cause or participate in an unreasonably lengthy detention before a *Gerstein* hearing.

In some cases, courts have found that arresting officers and officers working in lockups are not liable for an unreasonable detention because of their limited involvement in the detention. In *Swanigan v. Trotter*, 645 F. Supp. 2d 656 (N.D. Ill. 2009), two police officers arrested the plaintiff without a warrant, and after three hours they placed him in a holding cell and had no more contact with the plaintiff.  *Id.* at 677.  The *Swanigan* court granted summary judgment to the arresting officers on the plaintiff's *McLaughlin* claim because they had no personal involvement in the plaintiff's detention after they left him in lockup three hours after the arrest and the court reasoned that they could not be responsible for later events that made the length of detention unreasonable.  *Id.* at 677–78 (citing *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) (arresting officer who had no contact with or responsibility for plaintiff after he was taken to lockup 30 minutes following arrest on warrant could not be held liable for plaintiff's two-day detention)).  And in *Ortiz v. City of Chicago*, 686 F. Supp. 2d 782 (N.D. Ill. 2010) ("*Ortiz I*"), two defendant police officers who worked in their precinct lockup for the first eight hours after an arrestee's detention were held not liable for the fact that the arrestee did not attend the first available *Gerstein* hearing because the court found that they were not personally involved in the delay.  *Id.* at 799–800.  The court noted that the officers assigned to lockup did

not have any administrative tasks that extended the arrestee's detention, like updating the arrestee's rap sheet, and that no facts indicated they were responsible for, or even aware of, the length of the arrestee's detention. *Id.* The Seventh Circuit agreed with the district court's finding on appeal. *See Ortiz II*, 656 F.3d at 539–40.

In *Wells v. City of Chicago*, 896 F. Supp. 2d 725 (N.D. Ill. 2012) ("*Wells II*"), the court refused to disturb a jury's verdict finding that four police officers violated the arrestee's constitutional rights by placing a hold on the arrestee that caused his detention to last more than 48 hours after his warrantless arrest. *Id.* at 736–37. The court concluded that a reasonable jury could find that the four defendants together participated in the decision to place the hold on the arrestee that prevented his release because each individual defendant participated in the unlawful detention in his own way, including by telling the watch commander not to release the arrestee, holding him, investigating him, and approving his continued detention. *Id.*[6]

Finally in some situations, courts have found that defendants caused unreasonable detentions. Again in *Swanigan*, four other police officers placed a hold on the plaintiff, preventing his release from lockup in order to investigate whether the plaintiff had committed another crime. 645 F. Supp. 2d at 689. The court held that the two officers who asked for the hold, the lead investigator who requested the hold, and the watch commander who actually

---

[6] Hinsdale argues in a parenthetical that *Wells II* "up[held] a jury verdict against arresting officers on [a] duration of confinement because [the] officer was 'monitoring him and his movements and condition, et cetera[.]" Doc. 44-1 at 13. This is incorrect—the jury in *Wells II* did not find the arresting officers, Joann Butkus and Rachel Golubiak, liable for unlawful detention. *See Wells II*, 896 F. Supp. 2d at 729. The jury found that four other officers, the officers who together placed the hold preventing the arrestee's release, liable. *Id.* at 730; *accord Wells v. City of Chicago*, Case No. 09 C 1198, Doc. 352 ("On verdict, judgment is as follows: . . . on Count 8 of plaintiff's second amended complaint, in favor of plaintiff and against defendants Michael Deneen, Galo Gutierrez, Maureen McMahon, and Elliott Musial, and in favor of all other defendants against plaintiff[.]"). And while Golubiak testified that she was "monitoring [the plaintiff] and his movements and condition," *Wells II*, 896 F. Supp. 2d at 732, the court did not rely on this testimony to uphold the verdict against the four other police officers or even mention it when discussing liability of the other officers. *See generally id.* at 736–37 (discussing testimony of liable defendants who participated in the hold on the arrestee).

implemented the hold all caused the plaintiff's unreasonable detention as a matter of law because only they had the power to remove the hold. *Id.* In *Zawadowicz*, two arresting officers arrested the plaintiff without a warrant, questioned him, placed him in a lineup the next day, and then obtained and executed a search warrant on the plaintiff's home. 2012 WL 895494, at *1. 47 hours after the arrest, the arresting officers took the plaintiff to a police district lockup and the plaintiff appeared at a *Gerstein* hearing later in the afternoon. *Id.* The *Zawadowicz* court granted the plaintiff summary judgment against the arresting officers—by delivering the plaintiff to lockup with less than an hour to bring him to a *Gerstein* hearing within 48 hours, the arresting officers caused the plaintiff's unreasonable detention of more than 48 hours. *Id.* at *3. The arresting officers argued that the failure to deliver the plaintiff to a *Gerstein* hearing within 48 hours fell on the laps of the police personnel staffing the lockup because they were the last to hold the plaintiff and still had 48 minutes to bring him to court. *Id.* But the court found that the arresting officers caused the unreasonable detention, and could not shift blame to others, because by the time they brought the plaintiff to lockup, there were no more hearings available within 48 hours of the arrest. *Id.* And in *Lopez*, police officers arrested the plaintiff without a warrant after an eyewitness identification. 464 F.3d at 714. They then held him for four days and nights while they investigated the charges against him and collected more evidence. *Id.* The Seventh Circuit concluded that the plaintiff was entitled to judgment against the defendants. *Lopez*, 464 F.3d at 722.

With these decisions as guideposts, the Court considers the parties' motions on whether each individual Defendant caused the constitutional violation.

## A. Officer Tountas

Defendants argue that Tountas is entitled to summary judgment, arguing (1) that she was just Hinsdale's arresting officer, (2) that she maintained contact with him as a jailer because she was assigned to lockup and had no authority to release him, and (3) that her search of Hinsdale's phone to bolster the case against Hinsdale did not violate the Fourth Amendment. As discussed, the third point fails because "delays for the purpose of gathering additional evidence are per se unreasonable." *Lopez*, 464 F.3d at 714. Tountas cannot escape liability by arguing she was merely bolstering the case against Hinsdale. Thus the Court turns to the other arguments regarding Tountas' status as arresting officer and her subsequent role at lockup.

An arresting officer is not responsible for a plaintiff's continued detention after turning over the plaintiff to his jailers at the police station and having no further contact. *Tibbs*, 469 F.3d at 665 (arresting officer was not liable for plaintiff's two-day detention because arresting officer brought plaintiff to lockup within 30 minutes of arrest and then had no further contact with the plaintiff). But Tountas was more than just an arresting officer who cleaned her hands of Hinsdale after she placed him in lockup. Tountas continued monitoring and investigating Hinsdale, and she maintained some contact with him through 9:30 p.m. on October 10, 47.5 hours after she arrested him. Therefore Tountas is not entitled to summary judgment merely for being Hinsdale's arresting officer. *Compare Swanigan*, 645 F. Supp. 2d at 677–78 (arresting officers were entitled to summary judgment because they had no contact with plaintiff after bringing him to a police station holding cell within three hours of his arrest), *with Zawadowicz*, 2012 WL 895494, at *3 (granting summary judgment against arresting officers who continued investigatory contact with the plaintiff after the arrest, depriving the plaintiff of a *Gerstein* hearing within 48 hours of arrest).

Defendants also argue that Tountas cannot be personally liable because she received the assignments to check on Hinsdale in lockup and that the sergeant in charge of the lockup, rather than Tountas, is the only police officer who can be personally liable for Hinsdale's unlawful detention. A police officer assigned to lockup is generally not liable for an unlawful detention before a *Gerstein* hearing because the individual officer is performing a ministerial task that carries no more discretionary capacity than the bars that keep the jailed in the cell. *See Ortiz I*, 686 F. Supp. 2d at 800 (police officers assigned to lockup with no duties that could influence the arrestee's stay or release could not be personally liable for causing the unlawful detention); *cf. Wood v. Worachek,* 618 F.2d 1225, 1231 (7th Cir. 1980) ( "[A] jailer is liable for the illegal detention of an inmate when he unreasonably detains the inmate for arraignment or release . . . [b]ut if the errors upon which liability is asserted take place beyond the scope of his responsibility, he cannot be found liable where he has acted reasonably and in good faith."); *Bernard v. City of Palo Alto*, 699 F.2d 1023, 1027 (9th Cir. 1983) (noting that the county holding the plaintiff in jail could be held liable for delayed probable cause hearing because "[t]he County is responsible for operating the jail and has custody over arrestees . . . [with a] power to release arrestees unconstitutionally detained"). Tountas testified that she had no authority to release Hinsdale without the approval of the sergeant serving as shift commander of the lockup and that it was the shift commander's responsibility to ensure Hinsdale had a *Gerstein* hearing within 48 hours.[7] Fellers also testified that the shift commander was responsible for seeing that Hinsdale had a timely *Gerstein* hearing. And Policy 900 states that arrestees are detained at the Police

---

[7] Hinsdale does not allege that this sergeant or any other person responsible for the lockup at the Police Station is liable for causing the unlawful detention. *Compare Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("[T]he sheriff is the custodian of the persons incarcerated in the jail, and as such, it is he who is answerable for the legality of their custody."), *with* Westchester, Illinois – Code of Ordinances § 2.56.040 (Chief of Police—Duties . . . The chief of police shall be keeper of the village jail and shall have custody of all persons incarcerated therein.").

Station lockup with the approval of the shift commander.[8]  These facts suggest that, in checking on Hinsdale, Tountas was merely assigned to lockup rather than a jailer who had responsibility for ensuring Hinsdale was not unconstitutionally detained.

But Rauglas also testified that it was the responsibility of either the shift commander or the arresting officer, Tountas, to ensure Hinsdale had a *Gerstein* hearing within 48 hours of arrest.  And there is evidence that when she checked on Hinsdale in lockup, she knew that Hinsdale's detention was going to extend beyond 48 hours—she last checked in on him at 9:30 p.m. on October 10, when more than 47.5 hours had passed since she arrested him.  The confluence of Tountas' multiple roles as arresting officer, investigating officer, and lockup monitor suggest that the roles do not need to be treated separately or at least can be considered as influencing one another.  In *Zawadowicz*, the arresting officers functioned as investigating officers and lockup monitors as well, and the court found them liable for delaying the *Gerstein* hearing while serving all three roles.  *See* 2012 WL 895494, at *3.  But those officers chose to serve as their own *de facto* lockup monitors.  *Id.*  Here Tountas was assigned to lockup and may not have had the ability to release Tountas from lockup.  An issue of fact exists as to whether Tountas had the authority and responsibility to release Hinsdale, meaning she is not entitled to summary judgment on liability.[9]

---

[8] As discussed below, a factual question exists as to whether Policy 900 was even in effect at the time of Hinsdale's detention.

[9] Defendants cite *Wilson v. Baptiste*, No. 13 CV 07845, 2016 WL 521000 (N.D. Ill. Feb. 10, 2016) as an example of officers not causing a constitutional deprivation through detention of more than 48 hours.  In *Wilson*, however, the plaintiff did not receive a judicial determination within 48 hours because the department where he was being held post-arrest was short-staffed and no one could be brought to bond court.  *Id.*  Therefore, the plaintiff failed to show that either of the two individual defendants who arrested him caused the delay in the probable cause hearing.  *Id.*  Defendants here do not present any evidence that there was any administrative problem that prevented them from bringing Hinsdale to court.

Hinsdale cross-moves for summary judgment against Tountas, arguing that Tountas used the time after Hinsdale's arrest to investigate her case and obtain felony charges from the SAO and that she exerted control over Hinsdale while assigned to monitor the lockup facility, so she personally caused the 60 hour delay of his *Gerstein* hearing. Defendants counter that the post-arrest investigation of Hinsdale was "irrelevant to whether he was detained." Doc. 51 at 4. The Court disagrees with Defendants' characterization of the impact of Tountas' search of Hinsdale's phone—it certainly caused Hinsdale's detention to last through, at least, most of October 9. But Hinsdale still must show that Tountas delayed his *Gerstein* hearing more than 48 hours.[10] While Tountas' search extended Hinsdale's detention through October 9, there is no evidence she did anything more to bolster the case. At the point Tountas finished reviewing the contents of Hinsdale's cell phone, only 24 hours had elapsed since Hinsdale's arrest.

Defendants also argue that non-party third parties, not Tountas, caused the delay beyond October 9, suggesting that Tountas was not the proximate cause of the delay beyond 48 hours. A § 1983 case the "plaintiff must prove . . . that the action of the defendants proximately caused the constitutional violation." *Crowder v. Lash*, 687 F.2d 996, 1002 (7th Cir. 1982); *see also Vetter v. Dozier*, No. 06-CV-3528, 2010 WL 1333315, at *15 (N.D. Ill. Mar. 31, 2010) ("[P]roximate cause itself can be thought of as an umbrella term for concepts that help to answer the policy question of when liability should be imposed on an alleged tortfeasor." (citations omitted)). There is no evidence that Tountas investigated the case on October 10. In her deposition she testified that on October 10, the only issue preventing Hinsdale from a *Gerstein* hearing was "the felony approval charges." Doc. 40-5 at 18 (Tountas Dep. Tr. at 72:6–14); Doc. 40 ¶ 39. As

---

[10] The parties have not addressed whether the warrant and search of the phone caused Hinsdale's detention to be unreasonable before the 48-hour mark, *see, e.g.*, *Willis*, 999 F.2d at 289 (holding that plaintiff proved that bolstering case for 45 hours was unreasonable), so the Court will not address that issue now.

Tountas and Miklas testified, the Police Department deemed Hinsdale ready for a *Gerstein* hearing only after the SAO approved felony charges.

Hinsdale argues that Tountas was the one awaiting approval of felony charges from the SAO, meaning she was the one still delaying Hinsdale's *Gerstein* hearing. Waiting on the prosecutor's office to approve charges is not a reason to delay a *Gerstein* hearing for more than 48 hours. *Kyle v. Patterson*, 957 F. Supp. 1031, 1034 (N.D. Ill. 1997). But the summary judgment record does not show that it was Tountas delaying the hearing for the SAO felony review. Tountas only testified that she knew the SAO was conducting a felony review. Miklas, not Tountas, testified that the SAO approved felony charges for stalking around 6 p.m.[11] An unidentified police officer removed Hinsdale from his lockup cell after the felony charge approval, and an unidentified police officer then drove Hinsdale to court for a *Gerstein* hearing. The Court certainly can draw an inference that Tountas delayed the hearing to wait for the SAO to approve the felony charge because she was the arresting and investigating officer, but the Court also can draw a reasonable inference that police officers and officials other than Tountas were the ones delaying the hearing. Hinsdale fails to definitely show that Tountas was in fact the police officer waiting on the approval or that she delayed his *Gerstein* hearing to do so. *Cf. Kyle*, 957 F. Supp. at 1034 n.1 ("Defendants do not dispute that 'they,' without distinction, were responsible for Kyle's detention. The court will not enquire as to who actually had authority to release Kyle and chose not to do so while waiting for the State's Attorney's office to approve charges.").

---

[11] Reviewing the evidence backing this undisputed fact, *see* Doc. 42 ¶ 41, Miklas testified that a sergeant, Richard Stieber, sent an October 10, 2013 e-mail to John Carpino, the Village's Chief of Police at the time, stating that Hinsdale was "being charged with felony stalking and misdemeanor disorderly conduct" and would "be ready for bond court in the morning." Doc. 42-8 at 9–10 (Miklas Dep. Tr. 28:7–29:8).

Hinsdale argues that regardless, Tountas is liable because she kept him in detention while she was assigned to lockup. But, as discussed, there is a dispute of fact as to whether it was Tountas who kept Hinsdale in lockup and whether she had the authority to release him. *Cf. Wells II*, 896 F. Supp. 2d at 736–37 (holding that police officers definitively participated in unlawful detention by affirmatively placing a hold on plaintiff to prevent his release from lockup); *Kyle*, 957 F. Supp. at 1034 & n.1 (finding all defendants were responsible for detainment where they did not contest that they were all responsible for holding defendant and did not present evidence of who actually had authority to release defendant). Further, Hinsdale presents no evidence that he complained to Tountas about his extended detention or that Tountas refused to notify a superior about such a complaint. *Cf. Armstrong v. Squadrito*, 152 F.3d 564, 580 (7th Cir. 1998) (guards at lockup personally participated in 57 day detention of arrestee held on body attachment warrant because they refused to pass his written complaints about the detention to their superiors). And while Hinsdale argues that Tountas' actions were the same as the arresting officers held liable in *Zawadowicz*, that case is not binding precedent and the Court does not find her actions so analogous to *Zawadowicz* that it must impose liability at this time. Tountas was in contact with Hinsdale through at least 47.5 hours, the same as the defendant police officers in *Zawadowicz*. *See* 2012 WL 895494, at *3. But the *Zawadowicz* defendants intentionally held the plaintiff on their own and outside lockup to bolster their case against him, personally denying the plaintiff a *Gerstein* hearing within 48 hours. *Cf. id.* (noting police officers took arrestee to lockup 47.5 hours after arrest). Here, a reasonable inference can be drawn that Tountas stopped bolstering her case 24 hours after she arrested Hinsdale and that she was not responsible for and did not participate in the remaining length of his detention before his *Gerstein* hearing because another police officer was in charge of lockup and responsible for

bringing Hinsdale to the hearing. A jury must decide if Tountas sufficiently caused or participated in Hinsdale's detention to the extent necessary to be personally liable. Therefore, the Court denies Hinsdale's cross-motion for summary judgment as to Tountas.

**B.      Detective Miklas**

After the ASA requested a search of Hinsdale's phone, Miklas provided a sample search warrant to Tountas, accompanied her to court on October 9 for approval of the warrant, and brought Hinsdale's cell phone to the crime lab for processing. He also performed the lockup check at 6:20 p.m. on October 10, the second night after Hinsdale's arrest. While Miklas' role in the search appears minor, he participated in the same conduct as Tountas that precludes summary judgment against her. And while Hinsdale does not present any facts showing that Miklas conclusively caused his unlawful detention, a reasonable jury could conclude that Miklas participated in activity that caused the detention to last more than 48 hours or failed to alert the shift supervisor that Hinsdale's detention would exceed 48 hours. Thus, no party is entitled to summary judgment as to Miklas.

**C.      Officer Rauglas**

Rauglas assisted and backed up Tountas for Hinsdale's arrest, drove Hinsdale to the Police Station, inventoried his property, and then, after Hinsdale invoked his *Miranda* rights, had no further interaction with Hinsdale. Based on these facts, no reasonable juror could conclude that Rauglas acted to deprive Hinsdale of his right to a timely *Gerstein* hearing. Although it would be reasonable to infer that Rauglas knew that Hinsdale would still be detained on October 9, because Hinsdale was arrested in the late evening on October 8, no evidence exists in the record that would convince a jury that Rauglas had any involvement in or effect on Hinsdale's confinement past the morning of October 9. *See Swanigan*, 645 F. Supp. 2d at 677–78 (granting

summary judgment to arresting officers who relinquished control of arrestee hours after the arrest); *see also Gonzalez v. Tilmer*, 775 F. Supp. 256, 265 (N.D. Ill. 1991) (only the first 24 hours of arrestee plaintiff's detention were attributable to defendant officer who relinquished custody of plaintiff and could not be held responsible for actions that occurred after the change of custody). Nor can Hinsdale hold Rauglas responsible because he inventoried Hinsdale's cell phone immediately after his arrest. There is no evidence that this routine task that was incident to the arrest and confinement had any influence on the length of the detention; Tountas and Miklas separately obtained the search warrant for the phone the day after Rauglas inventoried it. *Hickombottom v. McGuire*, 765 F. Supp. 950, 953–54 (N.D. Ill. 1991) (granting summary judgment to police officers because plaintiff had no evidence that attributed what happened after 11 hours to defendants). Therefore, the Court grants summary judgment to Rauglas.

### D. Officer Fellers

On October 9, 2013, the day after Tountas arrested Hinsdale, Fellers was assigned to perform well-being checks on detainees in the lockup, and checked on Hinsdale three times that night. Fellers had no other interaction with Hinsdale. Like Rauglas, no reasonable juror could conclude that Fellers acted to deprive Hinsdale of his right to a timely probable cause hearing. Fellers was on duty at lockup during the day after Hinsdale's arrest, but that fact alone is insufficient to sustain a claim that Fellers is personally liable for the unlawful detention. *See Ortiz I*, 686 F. Supp. 2d at 800 ("Merely being on duty at the time Molina was in the lockup does not by itself support a finding of liability for the length of detention."). There is no evidence that Fellers was even aware of the length of Hinsdale's detention. *See id.* (granting summary judgment to the defendant and noting that, at the time, the defendant was not even aware of the length of the arrestee's detention). Therefore the Court grants summary judgment to Fellers.

## IV.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity because while it was clearly established that Hinsdale had a right to a *Gerstein* hearing within 48 hours of his arrest, they argue that it was not clearly established that the individual Defendants had to ensure that Hinsdale received a *Gerstein* hearing when the Police Department's policies placed timely hearing obligations on the shift commander.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (internal quotation marks omitted) (citation omitted).  The Court must ask "(1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation."  *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).  If both questions are answered "yes," then the individual Defendants are not entitled to qualified immunity.  The Court turns to the second question because it has already found that the answer to the first question is "yes" as to Tountas and Miklas.

"To determine if a right was clearly established at the time of an alleged violation, we look at whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation."  *Id.* (internal quotation marks omitted) (citation omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but . . . in the light of pre-existing law the unlawfulnenss must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (internal citation omitted).  In Fourth Amendment cases especially, courts are warned "not to

define clearly established law at a high level of generality." *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition" and "specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (original alterations omitted) (internal quotation marks omitted) (citation omitted).

As Defendants admit, and many other courts have said, "*Gerstein* and *McLaughlin* have been clearly established for decades." *E.g.*, *Zawadowicz*, 2012 WL 895494, at *4. Defendants argue that the shift commander at the lockup was the only person who violated Hinsdale's Fourth Amendment rights and that anything Tountas or Miklas did was done pursuant to policy in deference of the shift commander's authority and responsibility. But Hinsdale's best evidence viewed in the light most favorable to him shows that Tountas and Hinsdale delayed Hinsdale's *Gerstein* hearing for more than 48 hours to bolster the case against Hinsdale and wait for the SAO to approve felony charges and that, as testified to by Rauglas, Tountas may have had the same power as the shift commander to release Hinsdale from lockup. In *Lopez*, the defendants held the plaintiff for more than 48 hours while they gathered more evidence. 464 F.3d at 722. The Court found this behavior unconstitutional. *Id.* In *Kyle*, defendants defended their involvement in an unreasonable detainment by arguing that they had simply been waiting on the prosecutor's office—the court dismissed this excuse outright. 957 F. Supp. at 1034. In *Zawadowicz*, the court addressed "whether a reasonable officer in defendants' position would have understood that he bore responsibility to conclude the investigation in time for [the plaintiff] to appear in court within 48 hours." 2012 WL 895494 at *3. The court held that that

there was no qualified immunity. *Id.* at *3–4. And in *Wells II* several police officers violated a detainee's constitutional right to a prompt *Gerstein* hearing by acting in separate ways that, together, violated his Fourth Amendment rights. 896 F. Supp. 2d at 736–37. Viewed in the light most favorable to Hinsdale, the evidence shows that Tountas and Miklas violated clearly established rights. Therefore, Tountas and Miklas are not entitled to qualified immunity and are not entitled to summary judgment.

## V.      The Village's Liability

Hinsdale also alleges that the Village is liable for his alleged constitutional deprivation because of a policy or widespread practice within the Police Department. Under *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the Village may be held liable under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694. Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Hinsdale pursues his claims only through the first two avenues of liability—an express policy or a *de facto* policy, practice, or custom—and thus the Court need not consider whether liability can be established through the third method. Therefore, to prove his *Monell* claim, Hinsdale must show that "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy [or] widespread custom . . . which (3) was the proximate cause of his injury." *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002). The

Village moves for summary judgment, arguing that a procedural issue bars *Monell* liability at the summary judgment stage and that Hinsdale cannot prove that an express policy or a *de facto* policy caused his constitutional injury. Hinsdale cross-moves for summary judgment.

On December 11, 2015, the Village filed a "Limited Consent to Entry of Judgment Against Village of Westchester," consenting to entry of judgment against it for compensatory damages and attorneys' fees if the Court or a jury determines that an individual Defendant is liable, regardless of any determination of qualified immunity. Doc. 26. "*Monell* waivers" of this type serve as a shortcut through discovery and litigation, allowing a plaintiff to hold a municipality liable without proving anything beyond individual liability before the Village is held liable. *See, e.g.*, *Tanner v. City of Waukegan*, No. 10 C 1645, 2011 WL 686867, at *10 (N.D. Ill. Feb. 16, 2011) ("The stipulation does not extinguish Mr. Tanner's *Monell* claims if he fails to show individual liability; it only requires the City to pay Monell damages if he succeeds on the individual claims in order to save the burdens of discovery and trial. Indeed, no municipality could stipulate its way out of Monell damages in the way Mr. Tanner assumes."). After this "*Monell* waiver," the parties stayed discovery on the *Monell* claim. *See* Doc. 33 (acknowledging that discovery was stayed); *see also* Doc. 36 (denying motion to lift stay on *Monell* claim and setting summary judgment briefing schedule). But rather than wait to see whether the Court would grant summary judgment against the individual Defendants, Hinsdale chose to pursue summary judgment on his *Monell* claim, and he argues that he can still pursue a *Monell* claim even without proving individual officer liability by relying on *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2009).

In *Thomas*, the Seventh Circuit clarified that *Monell* liability may not require a finding of individual liability first, holding that "a municipality can be held liable under *Monell,* even when

its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.* at 305. To prevent inconsistent verdicts, courts determine whether a municipality's liability is "dependent on its officers" by looking "to the nature of the constitutional violation, the theory of municipality liability, and the defenses set forth." *Id.* Hinsdale alleged in his complaint that "in accordance with a policy or widespread practice . . . one or more of defendants Tountas, Rauglas, Fellers, and Miklas caused plaintiff to be held in custody for more than 48 hours while the officers sought to build a case against [Hinsdale]." Doc. 1 ¶ 5. A jury still must decide whether Tountas or Miklas is personally liable. If Hinsdale succeeds, the Village has stipulated it will pay Hinsdale damages.

If a jury finds that Tountas and Miklas did not cause Hinsdale "to be held in custody for more than 48 hours," *id.*, then a summary judgment decision that the Village's policy or custom caused the unlawful detention might conflict with the jury verdict. Further, Hinsdale implicitly admits that he may have named the wrong individual Defendants, asking the Court to find the Village liable before an individual defendant and "even if an employee other than a named defendant" is the person who actually caused Hinsdale's unlawful detention. Doc. 47 at 6–7. In contrast to cases where courts have allowed *Monell* claims to proceed without a claim of individual police officer liability because the plaintiff alleges in the complaint that the municipality's policies and customs caused non-defendants to violate the Fourth Amendment, Hinsdale's theory focused only on the named individual Defendants. *Cf. Evans v. City of Chicago*, No. 10 C 542, 2010 WL 3075651, at *4 (N.D. Ill. Aug. 5, 2010) ("Defendant [argues] . . . that holding the city liable without naming the police officers as defendants is inconsistent. However, that Plaintiff did not name the officers as defendants does not lead to the conclusion that there was no violation of constitutional rights, so there is no inconsistency in alleging

liability against the City of Chicago without naming the officers as defendants, and Defendant's argument accordingly fails.").

If *Monell* liability is an issue after a trial that results in a favorable verdict for Tountas and Miklas, Hinsdale must show that he is not seeking *Monell* liability under a different theory than the one he alleged in his complaint and that *Monell* liability will not result in inconsistent results. Despite the Court previously allowing Hinsdale to brief his *Monell* claim at summary judgment, Hinsdale has failed to show that he should pursue his *Monell* claim now. The Court acknowledges that it has determined that Hinsdale suffered a constitutional violation, so the Court will not dismiss Hinsdale's *Monell* claim. *Cf. Wozniak v. Zielinski*, No. 1:14-CV-05009, 2016 WL 5373077, at *14 (N.D. Ill. Sept. 26, 2016) (granting summary judgment to municipality where officer defendants were alleged to be the source of alleged harm and no Fourth Amendment violation occurred). But Hinsdale has not yet proven that an individual defendant personally caused or participated in the violation to be personally liable for the violation. Further, the prospect of judicial economy created by the individual Defendants' trial and *Thomas*' requirement for consistent results both counsel the Court to defer any needed resolution of Hinsdale's *Monell* claim until after the individual Defendants' trial. *See Tanner*, 2011 WL 686867, at *11 (noting that if plaintiff was able to proceed against municipality on claim after failing against the individual defendant, fully resolving the individual claim first would not preclude the plaintiff from still obtaining *Monell* damages). Therefore the Court defers ruling on the cross-motions on the *Monell* claim.

**CONCLUSION**

The Court denies Defendants' summary judgment motion [40] in part and grants it in part. The Court denies Hinsdale's cross-motion for summary judgment [43] in part and grants it in part. The Court finds that Hinsdale suffered a constitutional injury as a matter of law. The Court enters summary judgment for Rauglas and Fellers. The parties are ordered to report on whether Hinsdale pursues a Fifth or Sixth Amendment claim at the parties' next status hearing.

Dated: March 15, 2017

SARA L. ELLIS
United States District Judge